### MEESKE v. PFENNING'S ESTATE.

1. SURETIES—CONTRIBUTION—PAYMENT—BY WHOM MADE.
    The fact that a payment made by a surety, with the consent of his co-surety, in settlement of a claim against them, was by the check of a corporation of which he was an officer, will not affect his right to contribution from the co-surety, where he was charged by the corporation with the amount of the check.

2. APPEAL—EXCLUSION OF EVIDENCE—OBJECTIONS—PRIVILEGED COMMUNICATIONS.
    The exclusion of the testimony of an attorney as to a conversation with his client, upon the objection that it was privileged, will not be reviewed, and the character of the testimony, as privileged or otherwise, determined, where appellant conceded below that the conversation was privileged, and merely asked the witness for a conclusion which in that view was incompetent.

Error to Muskegon; Russell, J. Submitted April 19, 1899. Decided June 28, 1899.

Gustav Meeske presented a claim against the estate of

Casper Pfenning, deceased, for contribution to the payment of a claim against them as co-sureties on a bond. The claim was allowed in the probate court, and Helen Pfenning, administratrix, appealed to the circuit court. From a judgment for claimant, defendant brings error. Affirmed.

*James E. Sullivan,* for appellant.

*Stephen H. Clink,* for appellee.

HOOKER, J. The Muskegon Brewing Company was a corporation, and its only stockholders were Gustav, Otto, and Paul Meeske, respectively president, treasurer, and secretary. Each used the check of the company to pay his personal obligations, such check being charged against him upon the books of the company. For the fiscal year beginning May 1, 1893, Henry Seider furnished a liquor bond, with Gustav Meeske and Casper Pfenning as sureties. During that year one Johnson was drowned, and his widow subsequently prosecuted Seider and his bondsmen for causing his death, and recovered a judgment in the federal court at Grand Rapids against all of the defendants. That judgment was paid by Gustav Meeske with the brewing company's check, and he and Pfenning amicably adjusted the matter. Afterwards several children of Johnson began suits against the same parties, one of which went to judgment against them; and Gustav Meeske and Casper Pfenning determined that it would be wise to settle them, which was done for $1,300, which sum was paid, with some other items, by Gustav, with the brewing company's checks. Soon afterwards Pfenning died, and a claim for contribution was filed against his estate by Gustav Meeske.

At the time of said settlement, an assignment of the judgment was taken by the defendants' attorney, who drew it to the brewing company. It never came to the hands of either Gustav or the brewing company, but remained with counsel. Meeske testified that counsel was

not instructed to take such assignment to the brewing company. The defendant's counsel made the claim that the settlement was made with funds of the brewing company, and upon its behalf, and that it became the owner of the judgment and claims, and that the claimant, not having paid the judgment and the amount paid in settlement of other suits, has no right of action against the estate of his co-surety for contribution. The circuit judge left these questions to the jury, with the instruction that unless the claimant had proved that the judgment had been paid by him, and at his expense, he could not recover.

The claimant testified that he directed his lawyer to settle the cases, in accordance with an arrangement between him and his co-surety, Pfenning. He admitted that he paid the money to his lawyer, with which to settle, through a brewing company's check, and testified that he was in the habit of using those checks to pay his individual debts, the amounts being charged to him on the company's books. The defendant introduced no testimony, except that of Mr. Chamberlain, the lawyer who represented the claimant and his co-defendants. He testified that the firm of Chamberlain & Cross defended the case in the federal court, and that their employment was by the Muskegon Brewing Company, who paid them; that, after the judgment was rendered, it was assigned by Mrs. Johnson, for the purpose of taking steps to collect it as against the other defendants, who made no contribution to the payment that was made; that is, he purchased the judgment from the plaintiff with money that was furnished him by the Muskegon Brewing Company, and took an assignment to himself, and held it in trust for that company. He testified further that he was employed by the company to defend the other cases, and was paid by it. A judgment of $350 was obtained in one of these cases. There was talk about settlement, and he was instructed by the brewing company to settle the whole matter. His only talk was with Gustav Meeske. The examination proceeded as follows:

"*Mr. Clink:* Does the court think that is competent?

"*The Court:* I think so.

"*Mr. Clink:* He was your client in that case, was he?

"*Mr. Chamberlain:* Yes; he was my client in that case.

"*The Court:* Do you claim those communications were privileged?

"*Mr. Chamberlain:* It is for the court to say; whatever conversation occurred between Mr. Meeske and myself occurred as between client and counsel.

"*The Court:* If that privilege is claimed, I think it is good, as to the conversation.

"*Mr. Sullivan:* I haven't asked him about the conversation. Did you follow those instructions?

"*The Court:* What instructions are those?

"*Mr. Sullivan:* That were given you by Mr. Meeske in the settlement of that matter.

"*The Court:* That would be the same. I will sustain that objection.

"*Mr. Sullivan:* There hasn't been any objection made.

"*The Court:* It is the same rule. Of course, if it is privileged, it is a question for the court.

"*Mr. Sullivan:* It isn't unless it is objected to. Any communications made between counsel and client—These communications, if I understand the rule, are privileged communications, and we haven't got authority or right to go into what the communications were. Now, I asked him if he received any instructions. He said he did. I didn't ask him what those instructions were, at all; didn't ask him to break the privilege in any way, shape, or manner. As far as this record is concerned, that answer stands at this time.

"*The Court:* I understand what you asked; you asked to accomplish the same thing.

"*Mr. Sullivan:* Take an exception. (Witness shown Exhibits A, B, C, D, and E, stipulation and assignments of judgments.)

"*Q.* Those six papers that I have shown you, were they all one part of the same transaction, made at the same time?

"*A.* They were all made and executed substantially at the same time, and all with reference to the same transaction of the matter of the settlement of these suits. The check for $1,300 passed through my hands at about the same time, and the check and these papers all relate to

the same transaction. I ceased to act as attorney in these cases when I turned the papers over to Mr. Clink, which was some time prior to the 4th of March, 1898. Mr. Clink came to my office, and asked me for such papers as there were in the cases. · I found all there, and turned them over to Mr. Clink.

"*Q.* You say those different exhibits that were introduced here in evidence, with the exception of the check, that they were all prepared by you. By whose instructions were they prepared?

"*Mr. Clink:* I object to that as incompetent.

"*The Court:* I will sustain the objection.

"*Mr. Sullivan:* Take an exception.

"*Q.* Did you prepare the assignments of those two judgments to the Muskegon Brewing Company?

"*A.* Yes, sir.

"*Q.* Did Gustav Meeske instruct you to prepare those assignments?

"*Mr. Clink:* I object to that as incompetent and privileged.

"*The Court:* I will sustain the objection.

"*Mr. Sullivan:* Give me an exception.

"*Q.* Did Casper Pfenning ever instruct you to settle those cases?

"*A.* No, sir.

"*The Court:* Did he understand that you were operating for him together with the other parties, or don't you know?

"*A.* There was some conversation in which he took part. This conversation extended over a long period of time, and a good many consultations about it; and there were conversations in regard to some portions of this litigation in which Casper Pfenning took part, in which he was present.

"*Q.* Did you generally appear for him?

"*A.* I appeared for him, yes, in a general way, and entered a general appearance for the defendants in all these cases. There wasn't any special appearance for anybody, or any separate appearance for anybody.

"*Q.* Do you know whether he understood that or not?

"*A.* Why, I knew that he knew I was acting."

*Cross-examination by Mr. Clink:*

"*Q.* You say whatever talk you had with reference to this matter was with Gustav Meeske?

"*A.* In regard to the settlement?

"*Q.* Yes.

"*A.* I think exclusively. I don't remember having a conversation with anybody else on that subject at all.

"*Q.* You had no other employment in these cases, as far as Gustav Meeske or the Muskegon Brewing Company is concerned, than that which is set out in your written contract, did you?

"*A.* No, sir.

"*Q.* That covered this matter? That provided that you should take charge of the affairs—the individual affairs—of Gustav Meeske, did it not?

"*A.* The contract?

"*Q.* Yes.

"*A.* Well, I think it did. That was the understanding, at any rate, and that is what we did. Any private business that any of the members of the brewing company had to do, I did.

"*Q.* And Gustav Meeske was the party that you were representing in the case, was he not? The brewing company was not a party to that suit, was it?

"*A.* No, sir; the brewing company was not a party to the suit,—not to the record.

"*Q.* It wasn't a party to the suit, was it?

"*A.* No, sir.

"*Q.* Then in that suit you represented Gustav Meeske, didn't you?

"*A.* Why, sure.

"*Q.* Under this employment that you speak of?

"*A.* Certainly, I represented Gustav Meeske."

The record contains all of the evidence in the case. Under the proof, it was conclusively established that the settlement was made with the assent of Pfenning, through Chamberlain, who had acted and was acting as counsel for all of the defendants in the case. It is also conclusively established that the Muskegon Brewing Company was not a party to the litigation, and that the money paid was charged up to Gustav. The assignment was not made to the brewing company, but to counsel; and it was held for and on behalf of Gustav Meeske, who paid it. There was no proof to the contrary, and the court might properly have directed a verdict for the claimant upon the evidence as it stood.

It is urged that the court erred in excluding the answers to some questions asked by counsel for the defendant of the witness Chamberlain. On direct examination, defendant's counsel disavowed asking the witness for the conversation between himself and Gustav Meeske, relating to the settlement, which counsel for claimant contended to be privileged. Gustav had stated that he directed Chamberlain to settle the matter for a price which Chamberlain had named. Defendant's counsel asked Chamberlain to state what the instructions were. The court excluded the answer upon the ground that the conversation was privileged, and that the question practically asked for the conversation. In this last proposition the court was right, and he was also justified in holding that the question was objected to. Counsel apparently conceded that he was not entitled to the conversation, but insisted that the witness swear to the conclusion. Under these circumstances, the ruling should not be held erroneous upon the ground now argued, viz., that the conversation was not privileged, whatever we may think of the question of privilege.

The judgment is affirmed.

The other Justices concurred.